**COLUMBIA GAS CONST. CO. v. HOL-
BROOK.**

**In re ASHLAND CONST. CO.**

**No. 6877.**

Circuit Court of Appeals, Sixth Circuit.
Feb. 6, 1936.

As Modified on Denial of Rehearing
March 5, 1936.

Harold A. Ritz, of Charleston, W. Va.
(Dysard & Tinsley and W. H. Dysard, all of Ashland, Ky., and B. J. Pettigrew, of Charleston, W. Va., on the brief), for appellant.

Le Wright Browning, of Ashland, Ky. (George B. Martin, of Catlettsburg, Ky., Browning & Davis, of Ashland, Ky., Martin & Smith, of Catlettsburg, Ky., and Malone Prichard, of Ashland, Ky., on the brief), for appellee.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The appellant's grievance is that the court below construed a written contract when by the plain meaning of its terms construction was not required, and that, even if ambiguous, its construction was erroneous.

The Ashland Construction Company, as contractor, undertook to dig and back fill a trench for a 20-inch high pressure gas line being constructed by the Columbia Company for a distance of 18 or more miles through rough and hilly country from Right Beaver, Ky., to Pikeville, Ky. Its agreed compensation was 96 cents per lineal foot. After the completion of the work and the payment of all estimates, the contractor made claim for a substantial amount due for extra work not covered by the contract, and upon denial of its claim brought suit. Adjudication in bankruptcy of the contractor intervening, the proceedings were continued in the name of its trustee. At the conclusion of all of the evidence at the trial, the Columbia Company moved for an instructed verdict in its favor on the ground that the proofs failed to disclose any liability upon its part, and the denial of its motion is the only error that we shall consider.

The Columbia Company was engaged during the year 1931 in the construction of a high-pressure gas line from the mountains of Kentucky to the Potomac river. The line was constructed of joints of pipe approximately 20 feet in length and each weighing about half a ton. The joints were connected with "dresser" couplings and by weldings. The dresser couplings permitted deflection to the extent of two degrees. The topography being rough, and it being necessary to avoid sharp changes in alignment, frequent bends were necessary in the pipe as laid. These consisted of over bends and sag bends. Over bends were required upon hilltops, ridges,

and hogbacks; sag bends in ditches, streams, and other downward changes of contour. The gas line being constructed to convey gas under pressure up to 450 pounds per square inch, the tendency of the gas to blow the pipe out of the ground at over bends and upward deflections was great, requiring at such points additional depth in the trench and a heavier coverage of earth to prevent the line being broken.

The contract was entered into on April 24, 1931, and accompanying it were specifications incorporated therein by reference. The provisions of the agreement which give rise to the controversy include the first operable clause of the contract, which reads as follows: "The Contractor hereby agrees and undertakes, subject to competent inspection hereinafter described, to dig and excavate a ditch or trench to a minimum depth of four feet, a uniform width of twenty-six inches; * * * all work to be performed and carried out in compliance with and according to the provisions of this agreement, and the maps and specifications hereto attached and made a part hereof."

In respect to the depth of the ditch, the specifications include the following: "The depth shall not be less than 48" on level ground and even slopes. Wherever bends are required the depth of the ditch shall be increased to a depth acceptable to the first party's inspector or Superintendent. Where sag bends are used, the depth of the ditch may be reduced to a minimum of 36" at the discretion of the first party's inspector or Superintendent. * * * If and when the curvature of the bottom of ditch exceeds 2 degrees per 20 feet, the grade of the bottom of the ditch shall be modified to provide for the use of bends to take up their excess curvature, and these bends shall be located at the most practical point, to insure the safety of the completed line. All of this work shall be subject to approval of first party's inspector or superintendent."

It was established that the trench was dug to an average depth of 4 feet 11 inches, and the jury was permitted to return a verdict for work in excess of contract requirements.

Without following all of the subtleties of the trustee's argument, but broadly stating his view of the contract, which prevailed below, it is substantially this: The requirement of clause 1 for a minimum depth of 4 feet must be construed to mean an "average minimum" depth of 4 feet, since it is clear from the variations permitted by the specifications at sag bends and required at over bends that a uniform depth of 4 feet was not intended; that such construction is the sensible construction, gives force and effect to every provision of the contract and the specifications, removes conflicts or inconsistencies between them, and accords with a contemporaneous construction of the contract at the time it was drafted. The Columbia Company, on the other hand, asserts there is no ambiguity in the meaning of the term "minimum depth," no conflict between it and the phrase "not be less than forty-eight inches" in the specifications, and that the language otherwise used in both instruments is clear and unambiguous, leaving no room for construction.

It may be said at the outset that it is somewhat difficult to comprehend what is meant by the phrase "average minimum depth" as used in the court's instruction to the jury, and which the trustee must now vindicate. Perhaps what the court meant was that the contract required an "average depth of four feet," for average can be neither minimum nor maximum but the mean between the two. Even so, when the contract employs a standard of performance which may throughout the continuance of the work and throughout the length of the trench be aptly applied, there must be clear and compelling reason to assume that a test of performance was intended that can be applied only when the work is fully completed, for "average" is but an abstraction to be reached by computation only when all factors are known, and, whatever may be the depth of the trench at any given point, or whatever may be its average depth from the point of beginning to any given point, compliance may not be ascertained until the last foot of trench has been dug, for its average depth will vary with every step taken in performance.

■ The reasons which call for construction are asserted to be the ambiguity of the language used and the conflict between contract and specifications. Careful consideration of the agreement and an earnest effort to appraise the argument of the trustee fail, however, to dis-

close to us wherein the ambiguity lies, or wherein appears the conflict between contract and specifications. A provision that a trench shall have a minimum depth of 4 feet appears to us quite clear. Performance cannot be based, unless otherwise permitted, upon a trench that is anywhere less than 4 feet. This does not, of course, mean that the trench must be uniformly 4 feet in depth, because, if that were so, the term "uniform" would have been used, as it was used in the agreement in respect to the width of the trench, or the word "minimum" would have been eliminated. We are forced to no such alternative as reading the provision either as one requiring uniform depth or as one requiring average depth.

The contract having set up a standard of performance generally applicable to the carrying out of the work, that test is not made ambiguous by an additional provision that under certain circumstances a lesser performance may be permitted, or by specific recital of circumstances under which greater depth than minimum may be required. There is here no irreconcilable conflict. The provisions are clear and easily understood.

Not only does the contract clearly provide for a minimum depth of the trench subject to that requirement being waived by the company's superintendent at given places in the line, to wit, sag bends, but it also includes a maximum depth requirement, for the specifications provide that, wherever bends are required, the depth of the ditch shall be increased (over 48″) to a depth acceptable to the first party's inspector or superintendent. There is nothing unusual about this sort of provision in a construction contract, and nothing in the provision that renders the contract indefinite or uncertain, for, where extent of performance is left to either party's discretion or approval, such discretion or approval must be reasonably exercised, and there is no proof here that the maximum depth requirements at any stage of the work were either arbitrary or unreasonable, or not necessitated by topography. Moreover, the clause in the specifications which authorizes demand for depth greater than minimum is expressly qualified by statement of its purpose, and there is no contention that greater depth than minimum was at any point required for a purpose other than to safely graduate the bends to meet difficulties of terrain.

While the rule is that evidence to show the situation of the parties and the surrounding circumstances at the time a contract is made is admissible, yet, where the language employed is clear and unambiguous, there is no occasion for construction. Marx v. American Malting Co., 169 F. 582 (C.C.A.6); Corbett v. Winston Elkhorn Coal Co., 296 F. 577 (C.C.A.6); Canadian National Railway Co. v. George M. Jones Co., 27 F.(2d) 240 (C.C.A.6); Sampliner v. Maryland Casualty Co., 63 F.(2d) 332 (C.C.A.6). It is, of course, true that the terms employed may by custom and usage have a specialized connotation in a given environment. There is here no evidence of any special meaning to the phrase "minimum depth" recognized by those employed in the business of digging trenches, and evidence offered by the appellant to show that trench digging contractors would have understood the terms used to mean what they do to the ordinary mind was excluded. Moreover, the effort on the part of the trustee to show a contemporaneous construction by the parties at the time the agreement was made failed, for the letters that were offered in evidence were but rejected proposals made during negotiation and were clearly not part of the agreement. We are not here concerned with the fairness of the arrangement. The court has no power to make a new contract for the parties, and to strain at construction where the terms are clear would be the writing of an agreement into which the parties had not entered. Norton Iron Works v. Standard Slag Co., 13 F.(2d) 622, 623 (C.C.A.6).

Since in our view the contract is plain in its terms, and does not require construction, it is clear that all of the work done by the contractor came within the purview of the agreement, and was fully paid for according to its terms. The motion for directed verdict should have been granted. Our conclusion makes it unnecessary to consider error in the charge of the court or asserted practical construction given to the contract by the parties during performance.

Judgment reversed, and cause remanded for further proceedings consistent herewith, without prejudice to the right of plaintiff to submit proofs of unreasonable or arbitrary requirements by the defendant in the performance of the contract involved.