**SIAS et al. v. JOHNSON et al.**

No. 7072.

Circuit Court of Appeals, Sixth Circuit.

Dec. 15, 1936.

A. W. Penny, of Muskegon, Mich., and O. L. Smith, of Detroit, Mich. (Wiley, Streeter, Smith & Ford, of Detroit, Mich., and Penny & Clark, of Muskegon, Mich., on the brief), for appellants.

G. C. Leibrand and Karl K. Leibrand, both of Bay City, Mich. (Leibrand & Leibrand, of Bay City, Mich., on the brief), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

Appeal from a decree granting cancellation of a contract, ordering the reconveyance to appellant of a one-half interest in 3,500 acres of "wildcat leased land," holding that appellant Fred Sias has no right, title or beneficial ownership in certain real property known as the "Grubb 80" except by way of security, and determining in an accounting that appellant Fred Sias is indebted to the G-Lee-P Oil Development Company, the owner of the Grubb lease, in the sum of $57,238.33.

In December, 1929, Fred Sias, the principal appellant (his wife, Hattie Sias, having been joined merely for conveyance of her dower interests) held one-third of a seven-sixteenths working interest in an oil and gas lease on the "Grubb 80" acres, which was a valuable property in Michigan surrounded on three sides by oil-producing land. Waldo K. Webber and W. F. Stevens held the remaining two-thirds interest in the lease, and Webber, George L. Burrows and C. C. Stevens owned in common a half interest in the mineral rights in the same land. All five parties, on December 23, 1929, executed an option to assign the lease to Sias for $15,000, payable $5,000 on January 5, 1930, and the remainder on or before January 20, 1930.

On October 8, 1929, the G-Lee-P Oil Development Company was organized as a Michigan corporation, with an authorized capital stock of 200,000 shares of no par value. Practically the only asset of the company was 370 acres of so-called "wild cat" leased land. The Michigan Securities Commission restricted the issuance of stock to 62,500 shares, it being contemplated that the shares were to be sold for one dollar each. The lease of 370 acres is not attacked in this action. On December 14, 1929, Sias contracted with the company to assign to it a one-half interest in oil and gas leaseholds covering 3500 acres, the consideration being that the company was to drill two test wells at its own expense and pay the rental on the leases. On December 23, 1929, the parties entered into a supplemental contract, the material part of which is printed in the margin.[1] The contract was executed for the company by Edgar Lee, Jr., president, E. J. Lee, treasurer, and K. B. Potter, secretary. Both of the Lees were close relatives of Fred Sias.

In order to convey the entire working interest, an assignment of the lease and a conveyance of the mineral rights were prepared. Sias instructed Waldo K. Webber, one of the grantors and assignors, to have the papers executed to run direct to the company, although the option ran to Sias. After the instruments had been drawn in accordance with his instructions, Sias insisted that his name be written in with that of the company as assignee and grantee, and this was done, the name being inserted in ink in the typewritten instruments. As explained by Webber, "Mr. Sias came in and said that he wanted his name written in there as a grantee because he was putting up—they had had difficulty in raising the money or something to that effect and he was advancing the money to pay for that and he wanted his name in there, so his interest would be protected."

Appellees, residents of Massachusetts, had bought stock in the company in reliance on representations made by Sias through his stock-selling agents that the company was to get the entire seven-eighths interest. Sias asserted his claim for one-half of the seven-eighths interest some months after appellees bought their stock. Appellees then filed a bill of

[1] " * * * And whereas first party is in a position to secure for second party lease upon the West half of the Southwest Quarter of Section Two, Township Fourteen North Range Three West, Michigan, it is hereby agreed as follows: First party agrees to assist in securing a lease upon the said above described eighty acres and it is agreed that second well called for by such original contract shall be started upon said last described premises. Second party agrees to carry first party for the same interest in said lands described above as is provided for on the leases therein described in the original agreement above mentioned. In consideration of the terms first party further agrees to loan to second party the sum of Twenty Five Hundred Dollars to assist second party in the immediate drilling of said wells and pay to the said second party the sum of Seventy-Five Hundred Dollars being one half the purchase price of said lease. * * * "

complaint in the federal court in Michigan, and a decree was entered which in the main sustained their contentions.

Appellants raise a preliminary question as to compliance by appellees with Equity Rule 27, 28 U.S.C.A. following section 723, urging (1) that appellees were not shareholders at the time of the transactions complained of; (2) that this case is a collusive suit to confer jurisdiction upon the federal court, and (3) that no sufficient effort was made by appellees to secure action by the directors of the company.

■ We think the points have no merit. The gist of the controversy is where the title to the seven-eighths interest in the Grubb acreage resides, appellants claiming that the entire interest belongs to the company, and Sias claiming that he owns one-half of the interest. Sias had his name written into the assignment of the lease on January 20, 1930, after certain of the appellees became stockholders. If the decree is correct, he wrongfully received large royalties which belonged to the company after January 20, 1930. Also there is no evidence of collusion here. A non-resident plaintiff has a right to pursue in a federal court all of his remedies against a defendant, and it makes no difference what his motive may be in electing to invoke federal jurisdiction. City of Toledo v. Toledo Rys. & Light Co., 259 F. 450 (C.C.A.6); Harrison v. Love, Adm'r, 81 F.(2d) 115 (C.C.A.6). The fact that Michigan stockholders have borne part of the expense of the litigation does not alter this situation. Their interest was real, and the peril which threatened was real, or thought to be real, and hence their contribution to expenses cannot necessarily be regarded as proof of collusion. Wheeler v. City and County of Denver, 229 U.S. 342, 33 S.Ct. 842, 57 L.Ed. 1219.

■ The bill alleges that the directors refused to take any action to recover the company's rights, and the record presents ample evidence of an effort on the part of the minority stockholders to secure such action. At a stockholders' meeting on January 21, 1931, a group of minority stockholders demanded an explanation of Sias, and protested against his claim of half-ownership. Later a committee of stockholders requested the directors that suit be filed, if necessary, to recover this interest. The board refused and referred the matter to the company's attorney, who was also attorney for Sias.

■ Appellants also contend that appellees have no cause of action against Sias because the corporation had no right of action which appellees can enforce in its behalf. It is true that the stockholders must ground their suit on the rights of the corporation [General Investment Co. v. Lake Shore & Michigan Southern Ry. Co., 250 F. 160 (C.C.A.6)]; but if Sias had no title to the Grubb oil rights, then the company did have a cause of action against him. If Sias secured the lease and the conveyance for the company as its agent, and if there was no understanding that he should share in the interest, the company could rightfully pray for reformation of the instruments to conform to the true intent of the parties, and appellees could seek such reformation if the company refused to act.

■ It is appellants' main contention that the decree is not supported by the record. They urge that the contract of December 23, 1929, constituted an agreement that Sias should receive one-half of the working interest in the lease, and that the lease and assignment were executed in conformity therewith. The District Court found that the contract of December 23, 1929, was unconscionable because it was executed between the company and Sias while Sias occupied a fiduciary position. This finding is supported by the record. From October, 1929, all through these transactions, Sias was the moving force back of the company. In the period from December 4, 1929, to January 6, 1930, during which these two contracts were negotiated and executed, he and close members of his family held the majority of the stock. Sias himself assumed a dominating position in the company's affairs even before he was a shareholder, as is shown by his management of the advertising and selling of stock to prospective purchasers. He also performed the usual presidential duties for weeks prior to his election as president on January 21, 1930. The District Court correctly held that this fiduciary relationship rendered unconscionable the contracts of December 14, 1929, and of December 23, 1929, and the assignment and conveyance of the Grubb interest in 1930.

■ The contract of December 23, 1929, upon which Sias' claim of a one-half interest is founded is poorly drawn. It indicates the existence of an agency in Sias to secure the lease "for the company." This agency is inconsistent with the later provision claimed to

---

contemplate a half interest in Sias. The contract does not mention the undivided half interest in the Grubb mineral rights, but provides for the securing of the lease which covered only one-half of the working interest. The clause that Sias was to pay $7,500 of the purchase price of the lease cannot be reconciled with the provision that the company would "carry" him for one-half of the interest conveyed. If he was to receive a one-half interest and the company was to pay for that, or "carry" him for it, then Sias should not have been required to pay half of the purchase price. As the agreement is ambiguous, it must be interpreted in the light of its construction by the parties and the facts with reference to the Grubb acreage. Ohmer v. Allen, 79 F.(2d) 942 (C.C.A.6); Columbia Gas Construction Co. v. Holbrook, 81 F.(2d) 417 (C.C.A.6).

The District Court held that when Sias' name was inserted in the instruments he acquired no interest except a security interest for a loan made or to be made by him to the company. Stock of the value of $10,000 was later delivered by Sias to an oil drilling corporation for wells to be drilled on company property. The District Court gave credit to Sias for this, and all other expenditures made by him on behalf of the company.

We think the record supports the decree by clear and convincing evidence. Webber, a disinterested witness, testified that when Sias insisted that his name be inserted in the lease he said it was because "he was advancing this money and they could gather it up at some future date." The District Court found, and the record shows, that Sias secured the insertion of his name by the claim that it was for security. "Gather it up" indicates a contemplated repayment of an advance. The altered instruments were delivered to Sias. A witness testified that Potter, the secretary, stated several months later that "it was changed but he did not know why and it was changed without his consent." Potter did not testify. The convincing weight of the testimony shows that the change in the instruments was not known to the company. The claim that Sias had a one-half interest was first officially recognized by the company on August 27, 1930.

It is urged that certain representations of Sias that the entire seven-eighths interest belonged to the company were not relied upon by appellees. We think that a sufficiently close connection is shown between Sias and Reinhart to bind Sias, who in October, 1929, was planning a stockselling campaign with Reinhart, the authorized stock salesman. Reinhart's written statement that the seven-eighths interest belonged to the company was presented to a number of appellees before they bought their stock. But these declarations support the decree, whether or not appellees relied on them. The numerous statements made by Sias to prospective purchasers that the company had a seven-eighths working interest are strong evidence against his claim of a half interest in the Grubb acreage. Humphrey, a stock salesman, asked Fred Sias for something in writing to show prospective stockholders what the company's title to the Grubb acreage really was. Sias said that he did not have time to prepare such a statement, but that "Frank" (his son) would do it for him. Frank Sias then gave Humphrey a letter making the same statement as to the seven-eighths interest being owned by the company, signed "Fred Sias, by Frank Sias." During the stock-selling period Sias personally stated to at least eleven prospective purchasers that the company was to get the whole seven-eighths working interest in the Grubb acreage. Eleven witnesses testified by deposition that the same assertion was made to the Massachusetts purchasers through Sias' stockselling agents.

The company paid the full $15,000 purchase price without any aid from Sias, although he claims that the oil stock he later deposited with the well-drilling company was to be regarded as payment for 2,500 shares of stock and his half of the purchase price. In reality this stock was applied on the payment for the well drilled on the 3,500 acre leasehold.

It is also argued that representations made by Sias to stockholders or prospective stockholders did not raise an estoppel in favor of the company against Sias. However, on January 21, 1930, when Sias was elected director and president, he stated that the company's stockholders would get seven-eighths of the oil. This representation certainly lulled the company into a feeling of security as to its ownership. Sias is estopped as against the company to deny the truth of this representation.

The decree is affirmed.