**In re LWD, INC., LWD Trucking, Inc., LWD Sanitary Landfill, Inc., LWD Land Company, Inc., LWD Field Services, Inc., LWD Equipment, Inc., General Environmental Services, LLC, Debtors.**

**Official Unsecured Creditor's Committee of LWD, Inc., Plaintiff,**

**v.**

**K & B Capital, LLC, Defendant.**

**Bankruptcy Nos. 03–51018, 03–51019, 03–51021, 03–51022, 03–51023, 03–51024, 03–51373.**
**Adversary No. 04–05042.**

United States Bankruptcy Court, W.D. Kentucky, Paducah Division.

Feb. 10, 2005.

Mark C. Whitlow, Whitlow, Roberts, Houston & Straub, PLLC, Paducah, KY, for Debtors.

Douglas E. Spelfogel, Nixon Peabody LLP, Garden City, NY, Logan B. Askew, Hopkinsville, KY, Richard J. Bernard, Garden City, NY, Jeff S. Taylor, Jeff S. Taylor, P.S.C., Owensboro, KY, for Petitioning Creditors.

## MEMORANDUM–OPINION

THOMAS H. FULTON, Bankruptcy Judge.

THIS ADVERSARY PROCEEDING is before the Court after the conclusion of a trial on the merits of the claims brought by Plaintiff under 11 U.S.C. § 363(n) and 11 U.S.C. § 549(a) seeking damages, costs, and expenses, and the return of certain funds to Debtor's estate in connection with (a) Debtors' and Defendant's alleged transfer of funds to Defendant during the post-petition period from January 1, 2004, through March 25, 2004, and (b) Debtors' and Defendant's alleged failure to disclose a prepaid insurance policy during the period prior to the auction of Debtors' assets. This adversary proceeding was originally filed in Debtors' underlying Chapter 11 case as the Plaintiff/Official Unsecured Creditors Committee's Motion for Enforcement of Orders, Relief from Improper Conduct in Connection with Auction, and Related Relief [sic]. As agreed by the parties, the Court elected to treat such Motion as initiating an Adversary Proceeding; and on October 26, 2004, Plaintiff paid the prescribed $150.00 filing fee.

For the reasons set forth below, the Court determines that (i) without statutory or Court authorization, Debtors transferred to, and Defendant accepted $476,500.00 from, Debtors' estate and Defendant must, therefore, repay to Debtors' estate the $476,500.00 plus interest, which funds shall be held by Debtors' estate pending a further hearing to determine, for example, if Defendant is entitled to reimbursement of a limited portion of such funds, (ii) Debtors and Defendant failed to disclose the prepaid insurance policy and, therefore, Defendant must pay to Debtors' estate $352,375.00 plus interest, representing the value of such assets, and (iii) Plaintiff may file a "request" with the Court under 11 U.S.C. § 503(a), (b)(3) and (b)(4) seeking payment of Plaintiff's attorney fees and costs for bringing this Adversary Proceeding. By virtue of 28 U.S.C. §§ 157(b)(2)(A),(B),(E), (H), and (O) these are core proceedings. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### *FINDINGS OF FACT*

#### *Stipulated Facts*

The majority of facts relevant to this proceeding are not in dispute and were

stipulated by the parties in their Joint Stipulation of Undisputed Facts Concerning Motion for Enforcement of Orders, Relief from Improper Conduct in Connection with Auction, and Related Relief filed October 26, 2004, (the "Stipulation"). The relevant portions of the Stipulation may be restated as follows:

On June 30, 2003, certain petitioning creditors filed 11 U.S.C. § 303 involuntary petitions for relief under Chapter 7 of the Bankruptcy Code against the Debtors other than Debtor General Environmental Services, Inc. ("GES"). Pursuant to an agreed order (the "Stipulated Order") entered on or about August 29, 2003, orders of relief were entered against each of the Debtors other than GES. On or about September 5, 2003, GES filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The cases of the Debtors other than GES were converted to cases under Chapter 11 and were jointly administered, along with the GES Chapter 11 case, for administrative purposes in accordance with Federal Rule of Bankruptcy Procedure 1015(b). The Stipulated Order provides for the sale of substantially all of Debtors' assets under 11 U.S.C. § 363. Therefore, after entry of the Stipulated Order, the Debtors, Defendant and Plaintiff knew that substantially all of Debtors' assets would be sold.[1]

Debtors' official bankruptcy schedules do not disclose the existence of any insurance policies having pre-paid or unearned premiums. Schedule B for Debtor LWD Sanitary Landfill, Inc. discloses a trust account in the amount of $1,217,387.75, and Schedule B for GES refers to a closure fund in the amount of $838,000.00; however, none of Debtors' schedules refer to the existence of a 4–year, $3 million closure insurance policy with approximately 50% of the premiums thereunder paid for as of March 2004 (the "Closure Insurance Policy").[2]

On September 12, 2003, Debtors filed a motion under 11 U.S.C. § 363(c)(2)(B) seeking use of cash collateral. On September 26, 2003, the Court entered its Order Authorizing Use of Cash Collateral (the "Cash Collateral Order"). The Cash Collateral Order (i) allows Debtors to use cash collateral to avoid immediate and irreparable harm to Debtors' estates and, (ii) authorizes Debtors to pay Defendant an amount of up to $35,000.00 per week as adequate protection payments, and (iii) is made "without prejudice to any party, including the creditors' committee, to contest the amount and appropriateness of any payments to K & B or to contest the amount, priority or validity of any claims and/or liens asserted by K & B."

In connection with the anticipated sale of Debtors' assets, Debtors and Defendant, on October 31, 2003, filed a joint motion (the "Credit Bid Motion") for entry of an Order establishing the amount that Defendant could credit bid at any sale held pursuant to 11 U.S.C. § 363.

On November 25, 2003, Debtors filed a Motion to Allow Debtors in Possession to Finance Purchase of Trucks, seeking authority to borrow amounts from Defendant

---

**1.** Robert Kattula ("Kattula") is the sole shareholder of Debtor General Environmental Services, Inc. ("GES"), the sole director of each of the other Debtors, and the sole director of Trey Co. (the sole shareholder of each of the other Debtors). Kattula also claims to hold an irrevocable voting proxy for Trey Co. Kattula and his wife, Maria Kattula, have deci-sion making authority for Defendant. Kattula has authority to bind Defendant.

**2.** Based upon later deposition testimony of Defendant and Debtors, approximately $500,000.00 of the $954,000.00 premium was paid by March 2004, covering 2 of the 4 years under the Closure Insurance Policy.

up to $300,000.00 to purchase three 2003 Volvo trucks. On December 22, 2003, the Court entered its Order Granting Debtors' Motion to Purchase Trucks and Grant K & B Capital a Lien Thereon. Until around November 2003, Debtors paid an entity referred to as "RDK" $13,500.00 per month to lease these three trucks.

On November 26, 2003, Debtors filed a Motion for Section 363 Sale of Substantially All of Debtors' Assets (the "Sale Motion"). Paragraph 2 of the Sale Motion sets forth the principal assets to be sold by Debtors. Potential buyers for Debtor LWD, Inc.'s incinerator were required to contact the Commonwealth of Kentucky, but the Commonwealth of Kentucky had no duty to such buyers to disclose the financial assurances in place with respect to the Debtors' incinerator or landfill.

On or before December 31, 2003, Plaintiff conducted discovery of the Debtors' books and records in connection with the determination of Defendant's secured claim.

On January 26, 2004, Defendant filed its Pre–Hearing Brief of K & B Capital, LLC (the "Pre–Hearing Brief") in support of the Credit Bid Motion. Defendant asserted in its conclusion that "K & B Capital is certain that upon presentation of the evidence as the hearing on this matter, the Court will determine that K & B has established that it holds a perfected first mortgage lien on all of the assets of the debtor, and furthermore, that the amount of the credit bid to which K & B is entitled is approximately $5 million." The Pre–Hearing Brief included a report prepared

by Walker & Associates, as amended and revised (the "Walker Report"), which provides a line item for the $269,000 financing of "RDK Trucks." This line item was for the same trucks that were leased from RDK and were the subject of the Order Granting Debtors' Motion to Purchase Trucks and Grant K & B a Lien Thereon.[3] The Walker Report also contains the line item, "Closure insurance deposit," in the amount of $182,962.00. Plaintiff's accountants confirmed this payment and included it as a credit in their report.

On January 27, 2004, the Court entered an Order (the "Sale Approval Order"), approving the Sale Motion. Paragraph 3 of the Sale Approval Order provides in relevant part as follows: "On or before December 31, 2003, the debtors-in-possession shall supply to ClearBid [the Court appointed sales agent] detailed descriptions of the assets to be sold, based upon the current records of debtors-in-possession, which shall include the [principal Assets described in the Sale Motion]." In complying with the Sale Approval Order, Debtors did not disclose to ClearBid the existence of any prepaid closure insurance policies. Debtors provided ClearBid with a list of their insurance policies in response to ClearBid's requests; however, such list did not include any reference to the Closure Insurance Policy.

On February 9, 2004, Defendant filed its Objections to Proposed Sale Procedures Submitted by the Unsecured Creditors' Committee objecting to the inclusion of certain assets in ClearBid's lists of the Assets but failing to describe the excluded Closure Insurance Policy.

---

**3.** Notwithstanding, Dan Sills ("Sills"), Debtor LWD, Inc.'s chief operating officer testified under oath at a deposition held on August 11, 2004 that Debtors never purchased the trucks and Defendant never loaned any sums for the purchase. Rather, Sills and Kattula stated in deposition that Defendant, not the Debtors, purchased the trucks and then leased them to the Debtors. Defendant's account filed with this Court reflects three payments (on February 4, February 9 and March 1, 2004) of $13,500.00 each from Debtors to Defendant purportedly for these trucks.

On February 17, 2004, Debtors filed their Motion for Expedited Approval of Bidding Procedures, attaching proposed sale procedures. Debtors, on February 19, 2004, filed the first amended sale procedures (the "Bid Procedures"), setting forth sale procedures applicable at auction. ClearBid prepared lists of 5 asset groups that comprised Debtors' assets, which lists were utilized in the marketing of the assets and incorporated into the Bid Procedures and made a part thereof by reference. These lists were compiled in reliance upon information supplied by Debtors as required by the Sale Approval Order and clarified in response to Defendant's objection thereto. Defendant, in its objection to the lists of the assets, did not correct the exclusion of the Closure Insurance Policy.

On February 23, 2004, the Court approved an agreement entered into by Debtors, Plaintiff and Defendant on or about February 1, 2004 (the "Term Sheet") resolving Plaintiff's opposition to the Credit Bid Motion. Under the Term Sheet, Defendant's secured claim (including all claims asserted by Defendant as assignee or otherwise) for all pre-petition and post-petition transactions is allowed in the amount of $5 million, with Defendant allowed to credit bid up to $1.75 million. Paragraph 1 of the Term Sheet states: "K B Capital [Defendant] shall have an Allowed Secured Claim in the amount of $5 million, inclusive of any and all claims, charges, and fees of any and all kinds (and including all amounts included in the pending credit bid motion including those asserted by K & B as assignee or otherwise), subject in all respects (including as to payment and treatment) to the terms and provisions provided herein." The Term Sheet controls the treatment and payment of all of Defendant's secured claims and clearly sets forth Defendant's credit bid

and secured claim at $1.75 million and $5 million, respectively.

The Term Sheet also provides that Defendant could be reimbursed only up to a $75,000.00 cap for funds advanced by Defendant to Debtors "for actual and necessary operating expenses, net of collections, for the period between January 20, 2004, and the adjourned auction [on March 9, 2004]." Consequently, pursuant to the foregoing agreement which was approved by Order as of January 20, 2004, Defendant's allowed secured claim and credit bid were fixed and limited (except that Defendant could be reimbursed up to $75,000.00 for certain new advances through the auction sale) to the amounts provided thereunder. Defendant agreed to a carve out of its liens and security interests to effectuate the payments provided in the Term Sheet, including to provide for a split of proceeds(after accounting for other payments) 2/3 to Plaintiff and 1/3 to Defendant of funds received upon a sale to a third party of Debtors' assets in excess of approximately $2 million up to the amount of Defendant's allowed $5 million secured claim.

The Court ultimately scheduled an auction for March 9, 2004, in response to Debtors' motion for an auction under 11 U.S.C. § 363 (the "Auction").

At the opening of the Auction, Debtors provided an accounts receivable aging report as of March 5, 2004, plus adjustments as of March 8, 2004. This report reflects total accounts receivable in the amount of $564,966.39, comprised of approximately $315,000.00 of incinerator receivables (none of which were current because the Debtors shut down the incinerator in January 2004) and $250,000.00 of landfill receivables. The Asset Group 5 list (financial/other) contained information concerning Debtors' accounts receivable, totaling $1,372,578 as of September

29, 2003, which were being offered for sale at auction. Receivables as of December 31, 2003, were listed at approximately $1,250,000.00 according to the Debtors' operating reports filed with the Court. Also, at the Auction, Debtors stated that they had little to no cash in their bank accounts.

At the close of the Auction, Defendant was found to have made the highest and best offer for the Debtors' assets for a purchase price of $2,555,000.00 (including the incinerator which was purchased separately by Defendant for $5,000.00). The second highest offer was for all cash in the amount of $2,400,000.00 for all of Debtor's listed assets, excluding the incinerator assets, by Purchase Area Disposal Services, LLC ("PADS"). On March 10, 2004, the Court entered Orders provisionally approving the sale of the incinerator and non-incinerator assets to Defendant and scheduling a final hearing for the sales on March 18, 2004.

On March 23, 2004, the Court entered an order (the "Final Sale Order") approving and confirming the sale of Debtors' assets to Defendant. However, the Final Sale Order provided that if Defendant were unable to close the transaction, then PADS would be authorized to acquire the landfill assets and business as the second best bidder. It is clear that Defendant and PADS wanted to acquire the landfill assets as a going concern and wanted operations to continue until the sale closing. PADS offered to lease the landfill assets and business until closing, but Defendant made no such offer. From the March 9 auction to the March 25 closing, companies operating under Debtors' names incurred expenses and generated revenues.

On March 24, 2004, the Court entered its Order for K & B Capital, LLC to Submit an Accounting of Funds, requiring Defendant to account, by April 15, 2004, for all funds that Debtors paid to Defendant from January 1, 2004 through March 31, 2004.

The Court-approved sale of Debtors' assets to Defendant closed on March 25, 2004.

On April 15, 2004, Defendant filed its Notice of Compliance and accounting from January 1, 2004, through March 9, 2004, (the "Court–Ordered Accounting"). Thereafter, Defendant submitted to discovery by Plaintiff regarding the Court–Ordered Accounting and produced certain documentation in respect of Debtors' revenues and expenditures from March 9, 2004, through March 25, 2004. According to the Court–Ordered Accounting, Debtors made the following transfers to Defendant and Defendant made the following transfers to Debtors from January 1, 2004, through March 9, 2004:

| Transfers From Debtors to Defendant | | Transfers From Defendant to Debtors | |
|---|---|---|---|
| Date | Amount | Date | Amount |
| 1/9/04 | $35,000.00 | | |
| | | 1/20/04 | $33,000.00 |
| 1/21/04 | $35,000.00 | 1/21/04 | $20,000.00 |
| 1/23/04 | $35,000.00 | | |
| | | 1/30/04 | $25,000.00 |
| 2/2/04 | $35,000.00 | | |
| 2/4/04 | $13,500.00 | | |
| 2/9/04 | $13,500.00 | | |
| 2/13/04 | $35,000.00 | 2/13/04 | $25,000.00 |
| | | 2/19/04 | $10,000.00 |
| 2/20/04 | $35,000.00 | | |
| | | 2/24/04 | $25,000.00 |
| | | 2/25/04 | $12,000.00 |
| 2/26/04 | $35,000.00 | | |
| | | 2/27/04 | $25,000.00 |
| 3/1/04 | $13,500.00 | 3/1/04 | $5,000.00 |
| 3/5/04 | $35,000.00 | 3/5/04 | $2,000.00 |
| 3/8/04 | $35,000.00 | | |
| 3/8/04 | $35,000.00 | | |
| 3/8/04 | $32,000.00 | | |

During the period from January 21, 2004, to March 25, 2004, Defendant received transfers totaling $511,500.00 from Debtors. From January 21, 2004, to March 25, 2004, Defendant's accounting filed with the Court and produced in response to discovery provides that Defendant advanced sums to Debtors totaling

$149,000.00. These accountings also provide that, on January 9, 2004, Debtors paid Defendant $35,000.00 and that, on January 20, 2004, Defendant transferred $33,000.00 to Debtors.

### Additional Facts

The vast majority of facts needed for the Court's decision were stipulated by the parties. Certain additional relevant facts, however, may be gleaned from the trial on merits in these proceedings and also from the entire case record as a whole.

At the trial on the merits in this matter, Plaintiff acknowledged that $35,000.00 in funds previously thought to have been transferred to Defendant during the period from January 21, 2004, through March 25, 2004, were in fact transferred to Defendant after March 25, 2004. Therefore, the Court finds that, in total, $476,500.00 was transferred by Debtors to Defendant from January 21, 2004, through March 25, 2004.

At the trial on the merits, Plaintiff's witness, CPA Esther DuVal, testified that her firm, Mahoney, Cohen and Company ("Mahoney"), included in its calculation of Defendant's credit bid the amount of $269,000.00 for the line item in the Walker Report for financing of the "RDK trucks." The Court finds Ms. DuVal's testimony credible and additionally finds that Defendant received a credit in its credit bid for $269,000.00 representing the purchase of three 2003 Volvo trucks for Debtors.

Based on a plain reading of the Closure Insurance Policy, the Court finds that, assuming Debtors had chosen not to sell it at

auction, the Closure Insurance Policy could have been cancelled as of March 25, 2004, the closing date of the sale of Debtors' assets to Defendant. The Court further finds that upon such cancellation, Debtors' estate would have been entitled to a refund of $354,375.00, representing prepaid, but unearned premiums.

The Court takes judicial notice of the fact that the Debtors failed to file monthly operating reports for January 2004, February 2004 and March 2004 until December 2004, depriving the Court and creditors of critical information concerning financial dealings of the Debtors during that period [4]. Even when ultimately filed, the reports were not signed under penalty of perjury and lack any detail concerning transfers from the Debtors to Defendant or the Closure Insurance Policy. Other monthly operating reports filed by Debtors are similarly deficient.

The Court also takes judicial notice of the fact that at the closing of the sale of Debtors' assets to Defendant, Defendant used its entire $1.75 million credit bid as part of the consideration for Debtors' assets.

### CONCLUSIONS OF LAW

Two issues have been presented to the Court for determination in this Adversary Proceeding: (i) whether the Debtors improperly transferred the $476,500.00 to Defendant during the period from January 21, 2004, through March 25, 2004, and (ii) whether the Debtors adequately disclosed the Closure Insurance Policy.[5]

---

4. The Court can take judicial notice of documents filed in this case. *See In re Leach*, 35 B.R. 100 (Bankr.W.D.Ky.1983).

5. At the trial on the merits, certain testimony was elicited concerning allegedly improper payments to Glenn O'Connell, a one-time consultant to, and employee of, Debtors. Mr. O'Connell is not a defendant in this Adversary

Proceeding. Accordingly, the Court cannot make any finding as to the propriety of those transfers. Should Plaintiff wish to pursue such transfers, it will need to file a separate Adversary Proceeding against Mr. O'Connell with Court authorization.

### The Transfer of $476,500.00

Plaintiff cites 11 U.S.C. §§ 363(n) and 549(a) in asking the Court to order Defendant to return to Debtors' estate the $476,500.00 transferred by Debtors to Defendant.[6]

The Court can most easily dispose of Plaintiff's allegations under 11 U.S.C. § 363(n). Clearly, 11 U.S.C. § 363(n) addresses only an agreement among potential bidders at a § 363 sale that *controls* the sale price, not an agreement that merely *affects* the sale price. *See Lone Star Industries, Inc. v. Compania Naviera Perez Companc, S.A.C.F.I.M.F.A., Sudacia, S.A.*, 42 F.3d 747 (2nd Cir.1994).[7] Here, Plaintiff makes no allegation that potential bidders for Debtors' assets colluded to fix the sale price of the assets. Therefore, 11 U.S.C. § 363(n) cannot support Plaintiff's claims.

On the other hand, 11 U.S.C. § 549(a) does support Plaintiff's claims. Under 11 U.S.C. § 549(a), a trustee[8] may avoid unauthorized post-petition transfers of property of a debtor's estate. Plaintiff alleges that Debtors transferred the $476,500.00 to Defendant without authorization and that, therefore, such sum should be returned to Debtors' estate. Plaintiff bases its position on the Term Sheet. It argues, in essence, that the Term Sheet governs all transfers between Debtors and Defendant from January 21, 2004, through the closing of the sale of Debtors' assets and that any transfers not specifically permitted by the Term Sheet are prohibited. Defendant counters that the majority of the transfers in question were authorized by the Cash Collateral Order and that three of the transfers were simply payments for trucks leased by Debtors from Defendant.

Given that the parties agree that $476,500.00 in post-petition transfers to Defendant occurred, in disposing of Plaintiff's claim under 11 U.S.C. § 549(a), the Court must simply determine whether those transfers were authorized in whole or in part. Based on a plain reading of the Term Sheet, the Court must conclude that Debtors improperly transferred the $476,500.00 to Defendant and that, therefore, Defendant must pay the $476,500.00 back to Debtors' estate.

---

**6.** Plaintiff also cites 11 U.S.C. § 105(a), which gives the Court general equitable powers to enforce the Bankruptcy Code, as grounds for the relief sought. Because the Court finds in favor of the Plaintiff on this issue on other grounds, the Court finds it unnecessary to consider 11 U.S.C. § 105(a) here.

**7.** In all candor, the Court is somewhat puzzled that Plaintiff's primary attorneys, who are from New York, failed to find this New York reported bankruptcy case.

**8.** Plaintiff has brought the instant action on behalf of the debtors-in-possession with the Court's permission after notice and an opportunity to object by the parties. No party objected to Plaintiff's derivative standing. Plaintiff, through its Motion for Enforcement of Orders, Relief from Improper Conduct in Connection with Auction, and Related Relief [sic], made the instant colorable claims against Defendant, which would benefit Debtors' estate if proven. Having been given notice of such claims, Debtors chose not to pursue them on their own but have agreed to allow Plaintiff to pursue them. Accordingly, Plaintiff has satisfied the criteria for being granted derivative standing set forth in *Canadian Pacific Forest Products Limited v. J.D. Irving, Limited*, 66 F.3d 1436 (6th Cir.1995)(Plaintiff may meet its burden to allege unjustified inaction through notice pleading by alleging the existence of an unpursued colorable claim that would benefit the estate, and if the debtor-in-possession gives no reason for its inaction when a demand is made, the court may presume that its inaction is unjustified). See also *In re The V. Companies*, 292 B.R. 290 (6th Cir. BAP 2003); *In re Parmetex, Inc.*, 199 F.3d 1029 (9th Cir.1999) (finding creditor standing in a case brought under 11 U.S.C. § 549).

The Term Sheet could not speak more clearly when it states as follows:

Counsel for K & B Capital, Inc., the Debtors, and Official Creditors' Committee have agreed and stipulated to settle the pending motions concerning establishing the extent, amount and validity of KB's secured claim and credit bid. . . .

K B Capital shall have an Allowed Secured Claim in the amount of $5 million, inclusive of any and all claims, charges, and fees of any and all kinds (and including all amounts included in the pending credit bid motion including those asserted by K & B as assignee or otherwise), subject in all respects (including as to payment and treatment) to the terms and provisions provided herein.

. . .

Notwithstanding anything herein to the contrary, KB shall have an allowed credit bid of 1,750,000 and shall be authorized to bid all or a portion of such amount in connection with the Section 363 sale in this matter.

. . .

Upon sale to a third party of the Debtors' assets and business, the proceeds of any such sale(s) shall be paid in the following manner and priority. . . .

(iii) Up to $75k to KB for reimbursement of funds advanced by KB to the Debtors, for actual and necessary operating expenses, net of collections, for the period between January 20, 2004 and the adjourned auction date provided in # 4 (Debtors/KB to provide evidence of receipts and disbursements).

The Term Sheet, in particular the foregoing excerpt, makes it obvious that the parties intended the document to establish firmly the amount of Defendant's secured claim against Debtors as of the January 20, 2004; the manner by which Defendant could recoup the amount of its secured claim; and the extent and manner in which Defendant could recoup any advances of funds to Debtors made after January 20, 2004. Because it settled conclusively all of Defendant's claims against Debtors, the Term Sheet clearly operated to supersede and replace the interim Order Authorizing Use of Cash Collateral.[9]

■ Two witnesses for Defendant, Robert Kattula and Dan Sills, testified that they did not understand the Term Sheet as affecting the Order Authorizing Use of Cash Collateral, thus allowing Debtors to continue making weekly payments of $35,000.00 to Defendant. It is axiomatic, however, that a contract must be given its plain reading and that extrinsic evidence as to the parties' intent may only be considered where the terms of the contract are ambiguous. *See, e.g., Columbia Gas Const. Co. v. Holbrook,* 81 F.2d 417, 419 (6th Cir.1936) *(The Court has no power to make a new contract for the parties, and to strain at construction where the terms are clear would be the writing of an agreement into which the parties had not entered.)* Here, the contract in question, the Term Sheet, contains no such ambiguity.

Even if the Court were to consider the evidence presented in the form of Mr. Kattula's and Mr. Sills's testimony, the Court finds such evidence lacking in credibility. Mr. Kattula, in particular, presented an evasive demeanor and gave vague

9. The Court at the time certainly understood this to be the effect of the Term Sheet. Had Debtors complied with their duty to file timely and informative monthly operating reports for January, February and March 2004, and had those reports shown weekly transfers to Defendant of $35,000.00, the Court would have immediately scheduled a hearing to inquire why Debtors were not complying with the Term Sheet.

and self-serving testimony. Mr. Sills testified primarily regarding the Closure Insurance Policy. Although he did testify that it was his understanding that Debtors were to continue making adequate protection payments to Defendant even after approval of the Term Sheet, he could not answer why such an ostensibly important issue was never raised by Debtors and Defendant during negotiation of the Term Sheet.

■ Defendant tries to explain three of the payments from Debtors to Defendant as being payments for three Volvo trucks leased by Defendant to Debtors. Those trucks, however, were the same trucks for which a $269,000.00 line entry appeared in the Walker Report. Defendant received a $269,000.00 credit in its credit bid for the purchase of those trucks for Debtors and used its credit bid entirely as part of its consideration for purchase of Debtors' assets. Defendant cannot seek compensation again for costs that were previously reimbursed.

Defendant also tries to distinguish between transfers made by Debtors to Defendant during the period from January 21, 2004, through March 8, 2004, ("Pre–Auction Transfers") from transfers made during the period from March 9, 2004, through March 25, 2004, ("Post–Auction Transfers"). Defendant asserts that it bought Debtors assets as of March 9, 2004, the date of the Auction, despite the fact that the sale did not close until March 25, 2004. Therefore, it reasons, the Post–Auction Transfers were entirely proper because they were, in essence, simply transfers from *Defendant* to Defendant.

The Court agrees that the Post–Auction Transfers may be distinguished from the Pre–Auction Transfers. The Pre–Auction Transfers at least theoretically affected the price obtained at auction for Debtors' assets. For example, to the extent that Debtors collected on accounts receivables and transferred the cash received to Defendant prior to the auction, the potential sale price for Debtors' assets diminished. Post–Auction Transfers naturally would not have affected the potential sale price for Debtors' assets at auction.

■ On the other hand, the Court does not agree that the Post–Auction Transfers had no adverse affect on Debtors' estate. Debtors' assets did not become Defendant's assets until the closing of the sale, March 25, 2004. Until that date, Debtors were entitled to the benefit of their assets, particularly collected accounts receivable. Had Defendant not taken such assets, Debtors would have been able to use the assets to do such things as fund operations and/or cleanup. Presumably,[10] all or at least some of those funds would have been spent prior to March 25, 2004, and would not have been transferred to Defendant on the closing date.

The record is unfortunately incomplete regarding Debtors' operating and cleanup costs through March 25, 2004. Therefore, the Court finds that another hearing is warranted, at which time Defendant may attempt to prove what, if any, portion of the Post–Auction Transfer would not have been spent by reasonably prudent businesses in Debtors' industries. In other words, Defendant will have the opportunity to establish what amount of cash from collected accounts receivable should reasonably have been on hand at the date of the sale closing. The Court believes that equity requires that Defendant bear the burden of proof and that the evidentiary hearing should only be held *after* Defen-

---

10. The Court here refers to a hypothetical, independently managed debtor, not a debtor under common ownership with the purchaser of its assets.

dant has repaid what it has taken from Debtors' estate. Defendant was not the only bidder for Debtors' assets and its winning bid exceeded the losing bid by only around $150,000.00. If Defendant had not had the benefit of the money improperly transferred to it by Debtors, it might not have been willing to bid the amount needed to surpass PADS's $2.4 million bid. If PADS had thus prevailed, its all cash bid would have resulted in there being more cash in Debtors' counsel's escrow account today for distribution to the parties after the various competing claims are resolved.[11] Alternatively, had the Court determined prior to the auction of Debtors' assets that Defendant had received the improperly transferred funds, the Court would have ordered Defendant's credit bid reduced by the amount of the transferred funds. This would also have resulted in there now being more cash on hand in Debtors' counsel's escrow account.

■ The Court also believes that equity requires that Defendant pay interest on the $476,500.00. Otherwise, Defendant will have succeeded in obtaining, in essence, a $476,500.00 interest-free loan. Therefore, the Court concludes that Defendant must pay interest on each of the improper transfers comprising the $476,500.00, at a rate equivalent to the Federal Judgment Rate in effect on the date of the transfer, accruing from the date of the transfer through the date on which the transfer is repaid.[12]

Finally, having concluded that Defendant must repay the $476,500.00 taken from Debtors' estate, plus interest, the Court must now consider whether Defendant is entitled to repayment from Debtors for advances made as contemplated by Paragraph 5.(iii) of the Term Sheet. To the extent that Defendant can prove that it made such advances to Debtors, it would be entitled to repayment of up to $75,000.00. The record is also incomplete with respect to this issue. Therefore, the Court will hold a further evidentiary hearing at which the Defendant may attempt to prove whether it did indeed make any advances to Debtors during the period from January 21, 2004, through March 25, 2005, that should be reimbursed in accordance with the Term Sheet. Such hearing will be held on the same date as the hearing described above with respect to the Post–Auction Transfer.

### The Closure Insurance Policy

■ Plaintiff asserts that Debtors and Defendant failed to disclose the Closure Insurance Policy, which caused potential bidders to undervalue Debtors' assets and allowed Defendant to purchase the assets, including the Closure Insurance Policy, for inadequate consideration. Plaintiff wants the Court to order Defendant to pay to Debtors' estate an amount equal to the prepaid or unearned premiums on the Closure Insurance Policy as of March 25, 2004. In seeking such remedy, Plaintiff is in essence relying upon 11 U.S.C. § 105(a),

11. Although Defendant might argue that it would have been entitled to a distribution of those additional funds under the Term Sheet, as of the sale closing date the Court had already ordered the Debtor accounting which ultimately triggered this Adversary Proceeding. The Court would not have permitted distribution of sales proceeds to Defendant pending resolution of the accounting and this Adversary Proceeding.

12. There is an overriding consideration that "equitable principles govern the exercise of bankruptcy jurisdiction." *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). Moreover, in *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), the U.S. Supreme Court characterized bankruptcy court as a "specialized court of equity."

the Court's general equitable power to enforce the Bankruptcy Code. Although Plaintiff also cites 11 U.S.C. §§ 363(n) and 549(a) in its pleadings, it appears that Plaintiff relies on those provisions of the Bankruptcy Code more for redress of the $476,500.00 transferred by Debtors to Defendant. Furthermore, as discussed above, 11 U.S.C. § 363(n) clearly is inapplicable under the facts and circumstances of this case. Also, Plaintiff does not allege that the Closure Insurance Policy was transferred without authorization, so 11 U.S.C. § 549(a) would not apply here.[13]

■■■ 11 U.S.C. § 105(a) applies here because the fundamental question presented to the Court with regard to the Closure Insurance Policy is whether an important process envisioned by the Bankruptcy Code, sales under 11 U.S.C. § 363, has been subverted and the judicial process abused. As noted in a case cited by Plaintiff, *In re Wingspread Corp.*, 92 B.R. 87 (Bankr.S.D.N.Y.1988): "The federal courts have long been concerned with the integrity of the bankruptcy sale process." *In re Wingspread Corp.*, 92 B.R. at 92. Thus, the question is one of substantial fairness, whether Debtors disclosed the asset in a manner sufficient to allow potential bidders to value it properly and bid for it on a footing equal to that of the insider Defendant. As Plaintiff correctly notes, "[s]ales to fiduciaries are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse." *Id.*

Based on the stipulated facts, the Court finds that Debtors and Defendant failed to disclose adequately the Closure Insurance Policy, which allowed Defendant to obtain this asset for inadequate consideration.

The only time prior to the sale of Debtors' assets that any reference was made to anything approaching the Closure Insurance Policy was as a single line item in the Walker Report, an *attachment* to *Defendant's* brief in support of Defendant's Credit Bid Motion. That line item simply referred to a "Closure insurance deposit" in the amount of $182,962.00. As stipulated by the parties, no reference is made to the Closure Insurance Policy in Debtors' bankruptcy petition or schedules and the Closure Insurance Policy was never included in the list of Debtors' assets to be sold at auction, despite Debtors having reviewed and approved such list. Debtors make no mention of the Closure Insurance Policy in their monthly operating reports. Furthermore, Defendant's own witness, Mr. Sills, admitted at the trial on the merits that potential bidders lacked sufficient information to properly value the Closure Insurance Policy.

Having determined that the Closure Insurance Policy was not adequately disclosed, the Court must consider the most appropriate remedy. It is too late to treat the sale of Closure Insurance Policy as void and allow Debtors estate to sell it again or cancel it for a return of unearned premiums. A claim has been made upon it, rendering the Closure Insurance Policy incapable of being resold or cancelled. The only appropriate remedy is to require Defendant to pay to Debtors' estate a sum representing the value of the asset that it obtained without consideration. So, the question is what would have been adequate consideration for the Closure Insurance Policy.

13. Plaintiff does make an alternative argument that the Closure Insurance Policy is an executory contract that could not be sold under 11 U.S.C. § 363 but must be assigned and assumed under 11 U.S.C. § 365. Because the Court will grant relief to Plaintiff under 11 U.S.C. § 105(a), the Court need not consider whether the Closure Insurance Policy is an executory contract governed by 11 U.S.C. § 365.

In this regard, the Court finds it useful to consider what would have happened if the Closure Insurance Policy had not been sold to Defendant, but to a hypothetical, fully informed, independent third party. That buyer would presumably have bid up to an amount close to the "surrender value" of the policy—the amount of unearned premiums that would have to be refunded to the buyer if the Closure Insurance Policy had been cancelled as of the sale closing date, March 25, 2004. Under the terms of the Closure Insurance Policy, the hypothetical buyer would have been entitled to a refund of $354,375.00 on March 25, 2004. Therefore, such a hypothetical buyer would have been willing to bid an amount close to but not quite equivalent to $354,375.00 at the March 9, 2004, auction.

Theoretically at least, the maximum amount that the hypothetical buyer would bid would be the $354,375.00 "surrender value" of the Closure Insurance Policy less a discount comprised of the buyer's cost of borrowing 'the purchase price for one month plus a reasonable return on its investment. For the hypothetical buyer's cost of borrowing, the Court takes its cue from the U.S. Supreme Court in *Till v. SCS Credit Corporation*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) and looks to the national prime rate in effect in March 2004, an interest rate that "reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Till v. SCS Credit Corporation*, 124 S.Ct. at 1961. For the hypothetical buyer's reasonable return on its investment, the Court adopts the Federal Judgment Rate because this rate represents a conservative estimate of the minimum return that the hypothetical buyer could expect on an essentially risk-free, month-long investment. Accordingly, the Court believes a reasonable buyer would have bid no more than around $352,375.00 for the Closure Insurance Policy, which reflects a .33% cost of borrowing (i.e. the 4% prime rate divided by 12) and a .10% return on investment (i.e. the 1.23% Federal Judgment Rate divided by 12), rounded up to the nearest thousand dollars.

As with respect to the improper transfer of $476,500.00 to Defendant, the Court also believes that Defendant should be required to pay interest to Debtors' estate to compensate for Defendant's use of the funds represented by the asset. Therefore, the Court concludes that Defendant must pay $352,375.00 to Debtors' estate as consideration for the Closure Insurance Policy plus interest accrued on that sum at the Federal Judgment Rate in effect under 28 U.S.C. § 1961 on March 25, 2004, *i.e.* 1.18%, from March 25, 2004, until the date paid.

### *Plaintiff's Attorney Fees and Costs*

In addition to reimbursement for the $476,500.00 transferred from Debtors to Defendant and damages for failure to disclose the Closure Insurance Policy, Plaintiff also seeks an award of attorney fees and costs in bringing this Adversary Proceeding. The Court finds that in order to recover such costs and expenses, Plaintiff must file a separate "request" for the same under 11 U.S.C. § 503(a), (b)(3) and (b)(4).

The Court has entered a separate Order consistent with the foregoing. *Fed. R. Bankr.P. 9021.*

### ORDER

THIS ADVERSARY PROCEEDING is before the Court after the conclusion of a trial on the merits of the claims brought by Plaintiff under 11 U.S.C. § 363(n) and 11 U.S.C. § 549(a) seeking damages, costs, and expenses, and the return of certain

funds to Debtors' estate in connection with (a) Debtors' and Defendant's alleged transfer of funds to Defendant during the post-petition period from January 1, 2004, through March 25, 2004, and (b) Debtors' and Defendant's alleged failure to disclose a prepaid insurance policy during the period prior to the auction of Debtors' assets. Pursuant to the Court's Memorandum–Opinion entered this same date and incorporated herein by reference, and the Court being otherwise sufficiently advised, the Court finds in favor of Plaintiff and, therefore,

IT IS HEREBY ORDERED that:

(1) With respect to the unauthorized transfer of $476,500.00 from Debtors to Defendant, Defendant shall immediately pay to Debtors' estate, by depositing immediately available funds in Debtors' counsel's escrow account, $476,500.00, plus interest accrued on each of the improper transfers comprising the $476,500.00, at a rate equivalent to the Federal Judgment Rate in effect under 28 U.S.C. § 1961 on the date of the transfer, accruing from the date of the transfer through the date on which the transfer is repaid;

(2) With respect to the undisclosed Closure Insurance Policy, Defendant shall immediately pay to Debtors' estate, by depositing immediately available funds in Debtors' counsel's escrow account, $352,375.00, plus interest accrued on that sum at 1.18% per annum from March 25, 2004, until the date paid;

(3) Plaintiff may seek an award of attorney fees and costs in bringing this Adversary Proceeding by making a separate "request" for the same under 11 U.S.C. § 503(a), (b)(3) and (b)(4); and

(4) All funds paid pursuant to this Order shall be held in Debtors' counsel's escrow account pending further hearings to determine: (a) if any of the funds paid pursuant to Paragraph (1) above are funds that should reasonably have been cash on hand in Debtors' bank accounts as of March 25, 2004 and, therefore, may appropriately be refunded to Defendant; (b) if Defendant is entitled to reimbursement of a limited portion of the funds paid pursuant to Paragraph (1) above under Paragraph 5.(iii) of the Term Sheet; and (c) if requested by Plaintiff, whether Plaintiff may recover its costs and expenses in bringing this action from such funds under 11 U.S.C. § 503(a), (b)(3) and (b)(4).

This is a final and appealable Order.